George Ray WILLARD and Carol Willard, husband and wife, Plaintiffs–Appellees,

v.

Mark Wesley KELLEY, Defendant,

and

Prudential Property and Casualty Insurance Co., Defendant–Appellant.

No. 69347.

Supreme Court of Oklahoma.

Dec. 4, 1990.

Gary A. Eaton, Michael L. Seymour, Tulsa, for appellees.

John A. Gladd, Gibbon, Gladd & Associates, P.A., Tulsa, for appellant.

OPALA, Vice Chief Justice.

On affirmance of summary judgment for the insured, the insurer urges on certiorari that the evidentiary materials in the record support but a single inference—that the harm for which recovery is sought did not "arise out of the use of an uninsured automobile." Although we reject the insurer's proposition, we reverse the summary judgment and remand this cause for trial.

## ·I.

## ANATOMY OF LITIGATION

### A.

### *The facts affecting the claim*

While on patrol, police officer George Ray Willard spotted a vehicle driven by

then-suspected armed robber, Mark Wesley Kelley. As Willard attempted to stop him, a chase ensued. After colliding with two other cars, Kelley's automobile came to a temporary halt. The patrol car stopped behind it. Willard quickly drew his weapon as he stepped out beside his car. He then heard a gunshot and felt his left arm drop from its raised position. Although he immediately ducked behind his car door, more bullets were fired from Kelley's automobile. Several of them, penetrating the car door, struck Willard.

## B.

### *The case before the trial court*

Willard and his wife, Carol, [collectively called insured] sued both Kelley and their personal automobile insurance carrier, Prudential Property and Casualty Insurance Co. (insurer or Prudential). From the latter they sought to recover the limits of the policy's uninsured motorist (UM) coverage for bodily injuries sustained in the shooting incident. ·Willard alone pressed for recovery under the medical payments coverage.[1] Without affecting any issue in controversy between Prudential and its insured, default judgment was taken against Kelley, and, since the latter did not appeal, that judgment now stands as final.

The remaining parties in the lawsuit (the insured and insurer) stipulated to these facts: 1) at the time of the shooting Kelley was an uninsured/underinsured motorist within the meaning of the UM statute, 36 O.S.1981 § 3636,[2] 2) from within an automobile, Kelley "shot ... Willard several times thus inflicting wounds [upon several parts of his body]" while the latter was beside his patrol car and 3) the damages sustained by the insured "equal or exceed" the limits of the insurance policy's UM and medical payments coverages.

Each party sought summary judgment. The insurer argued that coverage is afforded *neither* by the UM statute *nor* by the insurance policy, which contains the following provision:

> "[Insurer is obligated] [t]o pay all sums which the insured ... shall be legally entitled to recover as damages from the owner or operator of an uninsured automobile because of bodily injury ... sustained by the insured, *caused by accident* and *arising out of the ownership, maintenance or use of such uninsured automobile....*" (Emphasis added.)

Prudential maintained that, as a matter of law, Kelley's act of shooting from an automobile does not constitute a "use" which gives rise to UM liability within the meaning of the quoted policy language. The insured, on the other hand, urged that the injurious event should be viewed as an "accident" stemming from Kelley's "continuous and uninterrupted" operation and use of an uninsured vehicle. The policy does not define the term "accident."

Prudential's refusal to pay Willard under the medical payments coverage appears to have been rested on the following policy provision which obligates the company

> "[t]o pay all reasonable expenses incurred within one year from the date of

---

**1.** Both George and Carol Willard are named as insured in the policy in suit, which covers two automobiles. Carol sought to recover under the UM provisions for loss of consortium. Even though they alleged multiple "causes of action," only one occurrence gave rise to their lawsuit; hence *each plaintiff has but one claim,* or cause of action, to press *for a single loss* covered by two different indemnity provisions of the same policy. See *Underside v. Lathrop,* Okl., 645 P.2d 514, 515–516 (1982); *Retherford v. Halliburton Co.,* Okl., 572 P.2d 966, 969–970 (1978).

**2.** The pertinent terms of 36 O.S.1981 § 3636 are: "(A) *No policy insuring against loss resulting from liability imposed by law for bodily injury* or death suffered by any person *arising out of the ownership, maintenance or use of a motor* *vehicle* shall be issued, delivered, renewed, or extended in this state ... unless the policy includes the coverage described in subsection (B) of this section.

"(B) *The policy ... shall provide coverage ... for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles* and hit-and-run motor vehicles *because of bodily injury, sickness or disease, including death resulting therefrom.* Coverage shall be not less than the amounts or limits prescribed for bodily injury or death for a policy meeting the requirements of Section 7–204 of Title 47, Oklahoma Statutes...." (Emphasis added.)

accident for necessary medical, surgical, X-ray and dental services ...

" * * * To or for the named insured ... who sustains bodily injury ... *caused by accident,*

" * * *

"(b) *while occupying a non-owned automobile,* but only if such person has ... the permission of the owner to use the automobile and the use is within the scope of such permission...." (Emphasis added.)

The trial court gave summary judgment to the insured and found 1) the injurious episode "was an accident which arose out of the use of an uninsured automobile" and 2) the insured is entitled to recover under the UM and medical payments provisions of the policy.[3]

## C.

### The issues in the Court of Appeals

According to the insurer's brief-in-chief, the UM protection Willard invokes in this case is neither mandated by § 3636 nor provided by the terms of the policy in suit, because his injuries did not arise out of the use of an uninsured vehicle. Prudential also argued that medical payments coverage, which is triggered only if the insured is injured while *occupying* an automobile, should not have been found applicable to this claim since Willard was "clearly outside" his vehicle when the shooting occurred.

The insured urged that the trial court correctly characterized the shooting incident as an accident which arose out of the gunman's (Kelley's) use of an automobile. In support of medical payments coverage, Willard relied on the policy's own definition of the term "occupying." Since it expressly includes "alighting from" an automobile, which, he contended, is what he was doing when Kelley opened fire, his presence "out-

side" the vehicle does not preclude recovery.

The Court of Appeals held that when considering insurance coverage, "the automobile need not be the proximate cause of the accident, but the broader requirement of causal relationship or connection is the appropriate test." Concluding that the insured's loss arose from the use of an uninsured car, the appellate court reasoned that Kelley's *vehicle* "was the causal relationship or connection between Kelley's actions and Willard's injuries." On the question of medical payments coverage, the court accepted Willard's proposition and affirmed the decision allowing recovery.

## D.

### The issues on certiorari

Prudential urges on certiorari that both the Court of Appeals and the trial court erroneously concluded as a matter of law that Willard's injuries arose from Kelley's use of the car. The essence of Prudential's position is that Willard's injuries arose from the use of a *firearm* which is not a "natural and reasonable consequence" of a vehicle's use; the gunman's criminal act (of shooting Willard) "intervened" between the vehicle's use as a means of escape and Willard's gunshot wounds. Based on the "same arguments" against Willard's quest for UM protection, the insurer views medical payments coverage as equally unavailable.

The insured's response to the certiorari petition seeks to provide a cogent foundation for the Court of Appeals' opinion and reasserts what the trial court, the Court of Appeals and the insurer all have *concurred in:* that the evidentiary materials tendered in the summary judgment process show that no material fact issues remain to be tried and that resolution of this claim hinges solely on a question of *law.* We reject

---

**3.** While the summary judgment against Prudential was expressly given to George Willard *alone,* the trial court also ruled that the insurer was "bound by the judgment against the Defendant, MARK WESLEY KELLEY, to the extent of the limits" of the UM and medical payments coverages provided by the insured's policy. The de-

fault judgment against Kelley favors Carol Willard as well as her husband. We hence treat the trial court's summary judgment under review, which *imposes on Prudential liability for Kelley's debt to the insured* to the extent of the insurer's coverage limits, as *comprising* the obligation due Carol Willard.

this notion because, based on our assessment of the record, *conflicting inferences may be drawn* from the material facts placed before the trial court.[1] Summary judgment for the insured was hence improvidently rendered. We grant Prudential's petition for certiorari to provide guidance upon remand.

## II.

### THE INSURED'S QUEST FOR UM RECOVERY

It is not contested that the insured's injuries, to be redressible, must have been 1) caused by an accident and 2) arisen out of the use of an automobile. These elements are the *sine qua non* of the UM claim at bar, and, for reasons to be explained, both are inextricably intertwined. We must hence address each of them as they relate to the instant case.[5]

**4.** While the trial court found an absence of factual issues for trial, its journal entry indicates that the "parties agree" no controversy exists as to any material fact. Although from the journal entry's recitation it might appear that the trial court's judgment was rendered *on stipulated facts* rather than summarily, we must treat the disposition as a summary judgment. This is so because the record is clear that not every material fact on the merits of the insured's claim stood stipulated (see Part IV of this opinion) and, even if some facts were indeed to be treated as undisputed, our conclusion is that they would not support but a single inference in favor of Prudential's liability. See *Spirgis v. Circle K Stores, Inc.*, Okl.App., 743 P.2d 682, 685 (1987).

**5.** When confronted with the question whether an injury has arisen from an automobile's use, most courts have—before reaching this issue for consideration—either *assumed* that an accident had occurred or *discussed* whether the injury was "accidental" or "caused by accident." See, e.g., *Celina Mutl. Ins. Co. v. Saylor*, 35 Ohio Misc. 81, 301 N.E.2d 721, 722 (Ohio Ct.Cm.Pl. 1973) (the *primary issue* was whether the insured's injuries, which resulted from an uninsured motorist's intentional assault, were "caused by accident"); *Employers Casualty Company v. Azar*, 28 Colo.App. 566, 479 P.2d 979, 979–980 (1971) (the court *presumed* the injuries were caused by an accident); *Criterion Ins. Co. v. Velthouse*, 751 P.2d 1, 2 (Alaska 1986) (the parties did not dispute, and the court presumed that the injurious event was an accident); *Ohio Cas. Group of Ins. Companies v. Bakaric*, 355 Pa.Super. 345, 513 A.2d 462, 464–465 (1986)

## A.

*The automobile policy requirement that the harm to be indemnified be one caused by an accident*

The insured had argued that the question whether an accident has occurred should be answered by assessing the harm-dealing event from his standpoint. Although the trial court specifically found that Willard's injuries were caused by an accident, the record is silent as to *how* the fact finding process was shaped.

█ The judicial approach of gauging the character of an injurious event from the insured's standpoint is not new to American jurisprudence. In cases where recovery was sought on a policy insuring against accidental death or injury, the terms "accident" or "accidental" have long been held to describe an occurrence which

(*before* deciding whether the injury arose out of an automobile's use, the court first addressed the question whether the injuries sustained by the insured were "expected or intended" from the insured's standpoint); *Sciascia v. American Ins. Co.*, 183 N.J.Super. 352, 443 A.2d 1118, 1120 (L.1982) (the *first* question the court analyzed was whether there was an accident); *Valdes v. Smalley*, 303 So.2d 342, 345 (Fla.App.1974) (in deciding whether the injury arose from an automobile's use the court *presumed* the harm-dealing event was an accident); *Nationwide Mut. Ins. Co. v. Knight*, 34 N.C.App. 96, 237 S.E.2d 341, 344 (1977) (although the trial court made no finding on whether the injury resulted from an accident, the appellate court—*before* deciding whether the injury arose from an automobile's use—discussed the *statutory* requirement that coverage must extend to *accident* victims and concluded that the injury, caused by gunfire from the insured's moving vehicle, "does not constitute an accident arising out of the ... use of such automobile"); *Southeastern Fidelity Ins. Co. v. Stevens*, 142 Ga.App. 562, 236 S.E.2d 550, 552 (1977) (although the court upheld the trial court's finding of a causal connection between the vehicle's use and the victim's gunshot wounds, the parties had "conceded that the pistol discharged accidentally"); *State Farm Mut. Auto. Ins. v. Smith*, 107 Idaho 674, 691 P.2d 1289, 1291 (App.1984) (the injurious event was presumed to have been an accident); *Tomlin v. State Farm Mut. Auto. Liability*, 95 Wis.2d 215, 290 N.W.2d 285, 288–289 (1980) (*before* reaching the question whether the injuries arose out of the vehicle's use, the court addressed the issue whether the harm was caused by an accident).

is unexpected, unintended and unforeseen *in the eyes of the insured.*[6] This is to say, even if an insured becomes the victim of an intentional act, the nature of the injury is nonetheless viewed as accidental, so long as the harm was not the reasonably foreseeable result of the insured's own wilful act or misconduct.[7] In the context of life and accident insurance this principle is also well established in Oklahoma.[8]

 While public liability insurance generally does not protect the insured *who intentionally inflicts harm upon anoth-*

er,[9] UM and medical payments coverages *afford indemnity to the insured for harm caused by another.* We therefore hold that, in the absence of a contrary provision, an automobile insurance policy which includes uninsured motorist and medical payments coverage as well as insures against injuries "caused by accident," *does* afford protection for harm that is *unprovoked, unforeseen, and unintended on the part of the insured.*[10] The objective "reasonable person" standard is to be applied in appraising the injurious event's character from the insured's perspective.[11] In light

6. See, e.g., *Hutchcrafter's Ex'r v. Travelers' Ins. Co.,* 87 Ky. 300, 8 S.W. 570, 571 (1888); *McGlinchy v. Fidelity & Casualty Co.,* 80 Me. 251, 14 A. 13, 14 (1888); *Railway Officials' & Employees' Acc. Ass'n v. Drummond,* 56 Neb. 235, 76 N.W. 562, 563 (1898); *Equitable Acc. Ins. Co. v. Osborn,* 90 Ala. 201, 9 So. 869, 870 (1890); *Richards v. Travelers' Ins. Co.,* 89 Cal. 170, 26 P. 762, 763 (1891).

7. See *Jones v. United States Mut. Acc. Ass'n.,* 92 Iowa 652, 61 N.W. 485, 490 (1894); *Lovelace v. Travelers' Protective Ass'n.,* 126 Mo. 104, 28 S.W. 877, 880 (1894); *Button v. American Mut. Acc. Ass'n.,* 92 Wis. 83, 65 N.W. 861 (1896); *Furbush v. Maryland Casualty Co.,* 131 Mich. 234, 91 N.W. 135, 136 (1902); *Meister v. General Accident, Fire & Assurance Corp.,* 92 Or. 96, 179 P. 913, 915–916 (1919); *O'Bar v. Southern Life & Health Ins. Co.,* 232 Ala. 459, 168 So. 580, 582 (1936); *Bernhard v. Prudential Ins. Co. of America,* 134 Neb. 402, 278 N.W. 846, 849 (1938). See also generally, Annot.: Accident Insurance: Death or injury intentionally inflicted by another as due to accident or accidental means, 49 A.L.R.3d 673; Annot.: Insurance: death or injury resulting from insured's voluntary act as caused by accident or accidental means, 7 A.L.R. 1131. National jurisprudence on the earlier annotation's subject holds:
> "[when] death or injury is not the natural or probable result of the insured's voluntary act, *or something unforeseen occurs* [while performing the act], the death or injury is held to be *within the protection* of policies insuring against death or injury *from accident or accidental means.*" (Emphasis added.) 7 A.L.R. 1131, 1133.

On the later annotation's subject,
> "the rule seems to be settled that although an insured is intentionally *killed or injured by another person,* the death or injury is *deemed to have been caused by accident* or through accidental means *where it was neither foreseen, expected, [nor] anticipated by the insured.*" (Emphasis added.) 49 A.L.R.3d 673, 679.

8. See *Union Accident Co. v. Willis,* 44 Okl. 578, 145 P. 812 (1915); *Mid–Continent Life Ins. Co. v.*

*Davis,* 174 Okl. 262, 51 P.2d 319, 321 (1935); *Continental Casualty Co. v. Goodwin,* 182 Okl. 311, 77 P.2d 742, 744 (1938); *United States Fidelity & Guaranty Co. v. Briscoe,* 205 Okl. 618, 239 P.2d 754, 757 (1952); *North American Acc. Ins. Co. v. Callicutt,* 206 Okl. 10, 240 P.2d 751, 753 (1952); *Republic National Life Insurance Co. v. Johnson,* Okl., 317 P.2d 258, 261–262 (1957).

9. See *Dayton Hudson Corp. v. American Mut. Lia. Ins.,* Okl., 621 P.2d 1155, 1159–1160 (1980).

10. Of the jurisdictions that have had occasion to decide whether the character of an injurious event in a UM claim should be assessed from the vantage point of the insured, virtually all of them have answered the question in the affirmative. See, e.g., *Ala. Farm Bur. Mut. Cas. Ins. Co. v. Mitchell,* 373 So.2d 1129, 1136 (Ala.Civ.App. 1979); *American Protection Ins. Co. v. Parker,* 150 Ga.App. 732, 258 S.E.2d 540, 542 (1979); *Country Companies v. Bourbon By Bourbon,* 122 Ill.App.3d 1061, 78 Ill.Dec. 407, 462 N.E.2d 526, 530 (5 Dist.1984); *Dyer v. American Family Ins. Co.,* 159 Ill.App.3d 766, 111 Ill.Dec. 530, 534, 512 N.E.2d 1071, 1075 (2 Dist.1987); *Sciascia v. American Ins. Co., infra* note 14, 443 A.2d at 1121; *Kish v. Central Nat. Ins. Group of Omaha, infra* note 14, 67 Ohio St.2d 41, 424 N.E.2d 288 at 293; *Celina Mutl. Ins. Co. v. Saylor,* 35 Ohio Misc. 81, 301 N.E.2d 721, 722–723 (Ohio Ct.Cm. Pl.1973); *General Acc. Ins. Co. of America v. Olivier,* 574 A.2d 1240, 1242 (R.I.1990); *Detweiler v. J.C. Penney Cas. Ins. Co., infra* note 14, 110 Wash.2d 99, 751 P.2d 282 at 286–287. See also generally, Annot.: Coverage Under Uninsured Motorist Clause of Injury Inflicted Intentionally, 72 A.L.R.3d 1161.

We note that judicial assessment of an injurious event from the insured's vantage point has already made its way into the body of Oklahoma's persuasive, though not precedential, UM jurisprudence. See *Stucky v. Long,* Okl.App., 783 P.2d 500, 503 (1989).

11. See *McGregor v. New World Life Ins. Co.,* 163 Wash. 677, 1 P.2d 908, 909 (1931), where the question was whether the insured's death was

of this applicable principle, the question for us to answer now is: Do the evidentiary materials in this record demonstrate the *absence* of a factual dispute over whether—from Willard's standpoint—his injuries were occasioned by accident? *We hold that they do not.*

Considering all the so-called "undisputed facts," along with the stipulations and surrounding circumstances of this case, we must conclude that reasonable minds may differ as to whether Willard *expected or should have expected* to be fired upon and seriously injured by the gunman. Nothing tendered in the summary judgment process sheds direct light on the foreseeability factor. Although the evidentiary materials appear to describe basically *what* happened, the record is inconclusive as to Willard's state of mind when, while carrying out his duties as a police officer, he pursued Kelley and eventually met him face to face. For instance, the trier *might* view

the facts as indicating Willard assumed the risk of a fight or confrontation *without voluntarily* assuming or exposing himself to the risk of serious bodily injury or death.[12] The insured's course of conduct, when measured by the evidentiary material in the record, is hence subject to different assessments; the issue remains one for the jury.[13]

### B.

### *The requisite connection between the insured's injury and the gunman's use of an uninsured vehicle*

■ Willard's UM policy covers injuries "caused by accident" *and* "arising out of the ownership, maintenance or use" of an uninsured automobile.[14] (Emphasis added.) Since the latter element of this UM claim contemplates a factual inquiry into the *causal relationship*[15] between the in-

---

accidental. There, the insured had voluntarily entered a room knowing that "entire strangers" were inside, intoxicated, armed and had been in a fight. "Without doing anything to provoke trouble" he was intentionally shot by one of the occupants. The court held that the insured's voluntary entry into the room, coupled with the intentional shooting,

> "does *not* prevent the death from becoming accidental *unless* (a) by misconduct [the insured] invited the act of [the gunman]; (b) he voluntarily and knowingly entered into danger; or (c) the act of [the gunman] *was reasonably to be anticipated by him.* If [the insured] was not guilty of misconduct, did not know and appreciate the danger, *or if the risk was not so apparent that an ordinarily reasonable man would be held to have known and appreciated it,* the killing was accidental within the meaning of the policy [which indemnifies for death] ... 'effected solely through external, violent and accidental means.'" (Emphasis added.)

**12.** Cf. *Lovelace v. Travelers' Protective Ass'n., supra* note 7, 28 S.W. at 879–880, where the insured was shot and killed during an altercation in a hotel office. The insured, a friend of the proprietor, had taken charge in the latter's absence when he attempted to eject a man who was "drinking and cursing." The court held "[t]he mere fact that [the insured] engaged in or brought on a fight in the manner described did not of itself indicate that he sought death, or had reason to expect it as a consequence of his action. * * * It may be assumed that by his course of conduct he *voluntarily assumed the risks of a fight; but there is nothing in the*

circumstances to show that he voluntarily assumed the risk of death." (Emphasis added.)

**13.** See *North American Acc. Ins. Co. v. Callicutt, supra* note 8, 240 P.2d at 754; *Metropolitan Life Ins. Co. v. Richter,* 182 Okl. 446, 78 P.2d 307, 308 (1938) (the court's syllabus ¶ 1); *Republic National Life Insurance Co. v. Johnson, supra* note 8, at 262. See also, *Detweiler v. J.C. Penney Cas. Ins. Co., infra* note 14, 751 P.2d at 284–285; *Furbush v. Maryland Casualty Co., supra* note 7, 91 N.W. at 136.

**14.** See *Hulsey v. Mid–America Preferred Ins. Co.,* Okl., 777 P.2d 932, 937 (1989), where we noted that a so-called "drive-by shooting" *might* occur under circumstances that would arise out of a vehicle's use.

Several jurisdictions have dealt with the question whether or under what circumstances an insured's gunshot wounds *may* be viewed as arising out of an uninsured motorist's *use* of a vehicle. See *Kish v. Central Nat. Ins. Group of Omaha,* 67 Ohio St.2d 41, 424 N.E.2d 288, 294–295 (1981); *Shouman v. Nationwide Insurance Company,* 42 Ohio App.3d 159, 537 N.E.2d 696, 697 (1988); *Sciascia v. American Ins. Co.,* 183 N.J.Super. 352, 443 A.2d 1118, 1121–1122 (L.1982); *General Acc. Ins. Co. of America v. Olivier, supra* note 10, at 1242–1243; *Detweiler v. J.C. Penney Cas. Ins. Co.,* 110 Wash.2d 99, 751 P.2d 282, 287 (1988); *Nationwide Mut. Ins. Co. v. Munoz,* 199 Cal.App.3d 1076, 245 Cal.Rptr. 324, 327–328 (1988).

**15.** In workers' compensation law, a determination that an injury *"arises out of"* employment

sured's injuries and Kelley's car use, the question next to be answered is whether the trial court correctly concluded that no fact issue exists. We hold that a question of fact does exist because conflicting inferences can be drawn from the facts in stipulation and those in the evidentiary materials.[16]

The record reveals 1) Kelley rested his gun on the car's "window sill" as he opened fire; 2) Kelley remained in the car at all pertinent times; 3) during the shooting, the getaway car may not have been in motion, but it was in a transportation mode (engine running and in gear); 4) Kelley left the scene by driving away. From these facts a jury *might* infer that the act of shooting was designed to facilitate Kelley's escape, impede Willard's pursuit, either or both. *Although when Kelley shot at Willard the car was not being used as a moving vehicle, the trier might nonetheless conclude that the shooting was related to Kelley's use of the car as a means of getaway and to retard Willard's pursuit.* UM-covered use is limited *neither* to the car's driving *operation nor* to the *lawfulness* of the use.

If, for instance, during the chase Kelly, instead of firing a gun, had thrown a large object out of the car and into Willard's path, causing him to crash, there would be little doubt that whatever had been thrown *from* the car facilitated a getaway *in the car* and thus may be deemed to have arisen from the car's *use as a means to accomplish the desired escape.* Similarly here, a jury may view the uninsured automobile's use as *incidental* to the pursuit of a car-aided effort to prevent Willard's apprehension of Kelley.

In sum, the *purpose* of the gun's use might be viewed by the trier as identical to that for which the car was used—*to impede Willard's pursuit and to facilitate Kelley's effective getaway.* If the gun use and the car use are found to be inextricably connected in purpose, the trier could conclude that a causal connection exists between the gunshot wound and the vehicle's use.[17] For reasons to be stated the yet-to-be-determined foreseeability issue must also be included in the inquiry into the shooting's causal nexus to Kelley's use of the car.[18]

In a case of ordinary negligence a defendant may seek to avoid liability with proof that an *intervening* force, which *directly* caused the injury, is also the proximate cause. The foreseeability of the intervening force will determine whether the chain of causation between the defendant's negligence and the injury is to be deemed broken. If the intervening force was foreseeable (or should have been anticipated), then the defendant's original negligence remains the proximate cause of the injury. On the other hand, if an unforeseen, unexpected and independent happening directly causes the injury, then the causal link between the original negligence and the resulting harm is deemed broken and the initial actor is thus insulated from liability.[19]

contemplates a causal relationship between the employee's actions at the time of injury and the requirements of employment. *Fudge v. University of Oklahoma,* Okl., 673 P.2d 149, 150 (1983); *Thomas v. Keith Hensel Optical Labs,* Okl., 653 P.2d 201, 202 (1982).

16. See *supra* note 4.

17. *Kelley's use of the vehicle as a means of getaway is consistent with the notion that automobiles are for locomotion.* It is for the trier to determine whether his use of the *gun* bears a direct link with the car's use when Kelly sat in the driver's seat with the vehicle still in a transportation mode.

18. See Appleman, The Law of Insurance, § 5092.55 at 393 ("there must be some connec-

tion between the harm done and the vehicle as an instrumentality, and *this must be considered equally with the intentional or accidental nature of the act*"); Widiss, Uninsured and Underinsured Motorist Coverage, § 11.4 at 374 (*"the use of the uninsured vehicle must relate relatively directly to the accident that caused the insured's injury"* (Emphasis added.)).

19. See *Brodsky v. Atchison, Topeka & Santa Fe Railway Co.,* Okl., 368 P.2d 852, 854–855 (1962); *Long v. Ponca City Hospital, Inc.,* Okl., 593 P.2d 1081, 1084–1085 (1979); *Atherton v. Devine,* Okl., 602 P.2d 634, 636 (1979); *Minor v. Zidell Trust,* Okl., 618 P.2d 392, 394 (1980); *Thompson v. Presbyterian Hosp., Inc.,* Okl., 652 P.2d 260, 263–264 (1982).

Similarly here, if the gunfire, which without question directly caused the injury, were to be found by the trier to have been unforeseeable from Willard's standpoint, then a jury *might* either be *less likely* to link Kelley's use of the automobile with the gunshot wounds he inflicted upon the insured or be *more likely* to conclude that the gunfire itself constitutes an *independent* intervening force which precludes the injuries from arising out of the automobile's use.[20] Indeed, Prudential argued that the causal nexus, if any, between Kelley's use of the car and Willard's injuries was broken by the gunman's "intervening" act of shooting. The issue whether a causal link exists between the use of a car and the injury is hence, *in this case*, inextricably intertwined with the question whether an "accident" had occurred.[21] Both factual issues depend in a large measure on the harm's foreseeability viewed from the insured's vantage point; both are nonseverable[22] jury questions.[23]

## III.

## WILLARD'S QUEST FOR MEDICAL PAYMENTS COVERAGE

■ The question here to be answered is whether, at the time of injury, Willard was *occupying* his patrol car within the meaning of his policy's medical payments provisions. We hold that he was.[24]

While the parties agree Willard had stepped out of the driver's seat when Kelley started shooting, the term "occupying" does include "alighting from" and "entering into" an automobile. Willard was shot *immediately after* he alighted from his seat and poised himself for a face to face encounter with Kelley. According to Wil-

**20.** Of course, if the harm, viewed from the insured's vantage point, is found to have been foreseeable or expected, then no accident may be said to have occurred and the insurer would then be fully insulated from liability.

**21.** See *Brodsky v. Atchison, Topeka & Santa Fe Railway Co.*, supra note 19 at 854–855; see also *Thompson v. Presbyterian Hosp., Inc.*, supra note 19 at 263–264; *Minor v. Zidell Trust*, supra note 19 at 394; *Long v. Ponca City Hospital, Inc.*, supra note 19 at 1084–1085.

*Brodsky*, where the trial court sustained a demurrer to the petition and this court reversed its judgment, serves as an example of the principle that when two or more fact issues are intertwined and one of them might appear undisputed if they be viewed separately, neither can be dealt with in isolation from the others as though it were wholly severable. There, the defendant in a negligence action had argued that the plaintiff's injuries were directly and proximately caused by another's negligence, which was an independent, supervening force that broke the causal chain. This court held that *foreseeability* is the test for determining *both* the existence of an actor's duty and the causal connection between the duty's breach and the resulting harm; if the intervening cause "should have been anticipated," the actor's negligent conduct will be deemed the proximate cause of the plaintiff's injuries. Foreseeability of harm from an intervening agency marks the outer limit both of the duty and of the causal nexus. Similarly here, foreseeability—viewed from the insured's standpoint—impacts both the insurer's duty to indemnify (for the "accident") and the harm's nexus to the uninsured vehicle's use.

**22.** For an example of intertwined issues, neither of which can be judicially resolved in isolation from the other, see *Flick v. Crouch*, Okl., 434 P.2d 256, 261–262 (1967), where *jurisdiction* of the district court over a wrongful death action *depended on* a party's *status* as an employee or independent contractor. Because conflicting inferences could be drawn from the known facts, the issue of jurisdiction had to be deferred until the jury's resolution of the party's status.

**23.** See *Shouman v. Nationwide Insurance Company*, supra note 14 537 N.E.2d at 697, citing *Kish v. Central Natl. Ins. Group of Omaha*, supra note 14. In *Kish* the Supreme Court of Ohio held, as a matter of law, there could be no causal connection between the use of the uninsured vehicle and the insured's gunshot wounds *where both the insured and the assailant had already "exited" their vehicles* when the attack occurred. In *Shouman*, the insured was injured by *gunfire that originated from the uninsured vehicle.* An Ohio appellate court held that the question whether a causal connection exists between the uninsured automobile's use and the gunshot wounds is hence one of fact; summary judgment for the insurer was held to have been improperly given.

**24.** In addition to arguing that medical payments coverage does not apply in this case, Prudential also *complains* that the insureds sought to "stack" the limits covering each of the two automobiles on the policy. Although the petition indicates this was so, the trial court did not give them the benefit of aggregated coverage. Since the insureds did not counterappeal, we need not address this question.

lard's deposition testimony tendered by Prudential, once the gunfire had ceased, he found himself leaning *on* his car seat, knees on the ground. From that position, he felt the patrol car move as Kelley pushed it with his vehicle and escaped.

Under these unique facts we hold that the policy's definition of "occupying" is broad enough to include Willard.[25] When first shot, he either was in the process of alighting from his vehicle or never actually left it. Upon being hit by the subsequently fired bullets, Willard was "entering" the car. We nonetheless express no opinion on whether Willard may ultimately recover under his medical payments coverage since the fact question whether his harm was "caused by accident" remains unresolved.

## IV.

## THE EVIDENTIARY PROBLEM AND THE LEGAL EFFECT, IF ANY, OF KELLEY'S CONVICTION

Although the insured had conceded almost every "undisputed" fact relied on by

Prudential, there is one point over which the parties differ. The insured maintains that Kelley merely shot "in the direction of Willard" and that the latter's injuries resulted from an "accident" or Kelley's "negligence" rather than from an intentional criminal act. Prudential had urged below that Kelley was convicted of the crime of shooting with intent to kill Willard. Inasmuch as this civil action is based on the same event for which, we are told, Kelley was held criminally accountable, the insurer urged that the issue of intent has already been resolved in its favor.

On this record it is apparent that Prudential attempted to use the criminal conviction to show that Willard's injuries arose purely from the commission of a crime rather than from acts that are interconnected with, or reasonably related to, the use of an automobile. The insurer had tendered a copy of the appearance docket in Kelley's criminal case to show he had been charged, tried and convicted of intentionally shooting to kill the insured.[26] Although Kelley's

25. Other jurisdictions have held medical payments coverage *applicable* in circumstances analogous to those here. See, e.g., *Stoddard v. "Aid" Insurance Co. (Mutual),* 97 Idaho 508, 547 P.2d 1113, 1115–1116 (1976) (insured, a "long time paraplegic," immediately after parking the car in his garage and hoisting himself into a wheelchair, smelled gasoline and went four feet toward the rear fender to inspect the gas tank cover, where he saw a flame; he suffered burns while exiting the garage); *Saint Paul–Mercury Indemnity Company v. Broyles,* 230 Miss. 45, 92 So.2d 252, 254 (1957) (insured stepped out of her car, closed the door, walked along its side and was "in the process of getting away from it" when the brakes slipped, allowing the car to roll and injure her); *Katz v. Ocean Acc. & Guarantee Corp,* 202 Misc. 745, 112 N.Y.S.2d 737, 739–740 (1952) (after stepping out of the car from the driver's side and while locking the door, the insured perceived an oncoming car, ran towards the rear of the car, only to be crushed between it and another vehicle parked behind it, when the feared vehicle struck her car); *Madden v. Farm Bureau Mut. Automobile Ins. Co.,* 82 Ohio App. 111, 79 N.E.2d 586, 588–589 (1948) (after the insured stopped on the street to change a tire, he was struck by an automobile as he was placing the removed tire in his trunk); *General Acc. Ins. Co. of America v. Olivier, supra* note 10 at 1241–1242 (after an automobile collision and at the investigating officer's request, the insured-passenger had exited her vehicle to

sit in the patrol car when she was shot and killed by the uninsured motorist whose negligence had caused the collision). Cf. *Hensley v. Life Ins. Co. of North America,* 551 F.2d 35, 36–37 (3rd Cir.1977) (beneficiaries prevailed against insurer on an accidental death policy which covered the risk of death occurring while the insured was "alighting from" a land vehicle; the decedent was shot and killed "as or shortly after she stepped from the passenger seat of an automobile"); *Mackie v. Unigard Insurance Co.,* 90 Or.App. 500, 752 P.2d 1266, 1269 (1988) (insured was struck by an automobile as she opened the trunk of her car; UM coverage applied because her "course of conduct [was] reasonably incidental to leaving and alighting from a car"). See also generally, Annot.: Automobile Insurance: When is .a person "occupying" an automobile within meaning of medical payments provision, 42 A.L.R.3d 501; Annot.: What constitutes "entering" or "alighting from" vehicle within meaning of insurance policy, or statute mandating insurance coverage, 59 A.L. R.4th 149.

26. The appearance docket in the criminal case shows "Robert Mark Kelley" as having been prosecuted. There is no stipulation in the appellate record that the defendant in the instant case, *Mark Wesley* Kelley, is the same person as the convicted criminal defendant. Since neither party has questioned the common identity, we will take it as true.

intent is not *per se* relevant on the issue whether an "accident" had occurred (see Part II(A) of this opinion), it may be a circumstance to be considered in assessing the *foreseeability of harm* as well as in appraising the *purpose* for which Kelley used the uninsured car and the gun with which he fired. The foreseeability of harm to Willard and Kelley's purpose in using both the car and the gun are relevant to the inquiry into the causal connection between Willard's injuries and Kelley's use of the uninsured vehicle (see Part II(B) of this opinion). For this reason we now provide guidance for dealing, on remand, with proof of a criminal conviction.

■ At common law judgments of conviction were *inadmissible* in a civil suit as proof of the facts essential to the criminal adjudication.[27] That legal norm now stands abrogated by the terms of the Evidence Code,[28] 12 O.S.1981 § 2803(22).[29] A *final* judgment of conviction is *conclusive evidence* of the facts adjudicated by its terms; if an appeal is pending or appeal time has not yet run, evidence of the conviction may be admitted as another circumstance for the trier's consideration.[30]

■ A trial judge, if called upon to do so, may take judicial notice of any record in the court on which he (or she) sits. When a case, pending or concluded in that court, is called to his attention and identified by number and style, a conviction cannot be proved by an appearance docket alone. It must be established by competent evidence[31]—i.e., the judgment roll.[32] Prudential may have done enough to benefit from judicial notice by tendering below a copy of the appearance docket in Kelley's criminal case, but, on this appellate record, *the conviction has not been proved by the law's acceptable method.*

CERTIORARI IS GRANTED; THE COURT OF APPEALS' OPINION IS VACATED; THE TRIAL COURT'S SUMMARY JUDGMENT AGAINST THE INSUR-

---

27. See *Haynes v. Rollins*, Okl., 434 P.2d 234, 237–238 (1967); *Goodwin v. Continental Casualty Co.*, 175 Okl. 469, 53 P.2d 241, 242 (1936).

28. See *Lee v. Knight*, Okl., 771 P.2d 1003, 1004–1005 (1989), where this court gave effect to the § 2803(22) legislative abrogation of the common-law rule.

29. The terms of 12 O.S.1981 § 2803(22) are: "The following are *not excluded* by the hearsay rule, even though the declarant is available as a witness:
"* * *
"22. *Evidence of a final judgment, entered after a trial* or upon a plea of guilty, but not upon a plea of nolo contendere, *adjudging a person guilty of a crime punishable by death or imprisonment in excess of one (1) year, to prove any fact essential to sustain the judgment,* but not including, when offered by the state in a criminal prosecution for purposes other than impeachment, judgments against persons other than the accused. The pendency of an appeal may be shown but does not affect admissibility;
"* * * *" (Emphasis added.)

30. *Benham v. Plotner*, Okl., 795 P.2d 510, 513 (1990).

31. See Rule 13, Rules for District Courts, 12 O.S.Supp.1984, Ch. 2, App., which provides: "a. * * * The motion [for summary judgment] shall be accompanied by a *concise written statement of the material facts as to which* the movant contends no genuine issue exists and the reasons why summary judgment should not be granted. * * *
"b. If the adverse party or parties wish to oppose the granting of the motion, they shall serve on the moving party and file with the court clerk within fifteen days after service of the motion a concise written statement of the material facts as to which he or they contend a genuine issue exists and the reasons for denying the motion. The adverse party shall attach to the statement affidavits and other materials containing facts *that would be admissible in evidence,* but the adverse party cannot rely on the allegations or denials in his pleading. * * *
"c. The affidavits that are filed by either party shall be made on personal knowledge, shall show that the affiant *is competent to testify as to the matters stated therein,* and shall set forth *matters that are admissible in evidence.* "* * * *" (Emphasis added.)

32. The appellate record in this case does not contain the judgment roll of Kelley's criminal conviction, which would constitute the only *admissible* proof of the essential facts to be accepted as conclusive and hence barred by the criminal judgment from relitigation in a civil case. The legal effect of a finally adjudicated case is measured by the *four corners of its judgment roll. Reeves v. Agee*, Okl., 769 P.2d 745, 752 (1989); *Mayhue v. Mayhue*, Okl., 706 P.2d 890, 895 (1985); *Timmons v. Royal Globe Ins. Co.*, Okl., 713 P.2d 589, 592 (1985).

ER IS REVERSED; CAUSE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS PRONOUNCEMENT.

HARGRAVE, C.J., and HODGES, DOOLIN, ALMA WILSON and KAUGER, JJ., concur.

LAVENDER and SUMMERS, JJ., concur in part and dissent in part.

SIMMS, J., dissents.

SIMMS, Justice, dissenting:

I concur with the views expressed by Justice Summers insofar as he dissents from the majority decision, however, for the same reasons expressed therein I would also hold the medical payment provisions are inapplicable to this situation.

I agree with Prudential's argument that it was entitled to judgment as a matter of law. Coverage of this shooting incident was not afforded by either the terms of 36 O.S.1981, § 3636, or the insurance policy. I must, therefore, respectfully dissent from the majority opinion.

SUMMERS, Justice, concurring in part and dissenting in part:

The question is whether summary judgment for plaintiffs was proper. The trial court granted summary judgment, holding that the plaintiffs were entitled to insurance coverage both under the uninsured motorist and medical payment provisions. As to the medical payments coverage I can concur with the majority. As to the uninsured motorist coverage the majority holds that whether or not the shooting was accidental, from the policeman's vantage point, is a material fact in dispute. As I view it the insured is not entitled to recovery unless he can show that the injury was accidental *and* that the injury arose out of the use of an uninsured vehicle. I must respectfully dissent because I believe as a matter of law that the injury did not arise out of the use of the vehicle. The question of whether the injury was "accidental" is purely academic, and its resolution is not necessary to the correct disposition of this case.

Prudential urges that uninsured motorist coverage should be denied and summary judgment should be granted in its favor because, as a matter of law, the shooting of Willard did not arise out of the use of the vehicle. Generally, when addressing the question of "use," courts apply the "causal connection" test. *See annotation,* 15 ALR4th 10 (1982). A causal connection does not require proximate cause in the strict legal sense, nor does it require an inquiry into the intent of either party at the time of the accident. Rather, it requires that the "vehicle be more than the mere situs of the accident and that the use of the vehicle relate to its inherent use as a motor vehicle." *Criterion Ins. Co. v. Velthouse,* 751 P.2d 1, 3 (Alaska 1986). This term has also been defined as mandating that the accident arise out of the inherent purpose of the vehicle. *Tomlin v. State Farm Mutual Auto. Liab. Ins. Co.,* 95 Wis.2d 215, 290 N.W.2d 285, 290 (1980); *Employers Casualty Co. v. Azar,* 28 Colo.App. 566, 479 P.2d 979, 980 (1970). In the absence of effects caused by the movement of a vehicle, a vehicle is inherently no different than any other object or location, and it becomes merely the situs of the injuries, bearing no causal relationship to its nature as a vehicle. *Reynolds v. Allstate Ins. Co.,* 400 So.2d 496, 497 (Fla.App.1981).

When making the determination of whether an injury arose out of the use of a vehicle, it is also important to consider whether the parties intended to contract against the particular incident. For example, in *Sciascia v. Am. Ins. Co.,* 443 A.2d 1118, 1122 (N.J.1982), the court held that the firing of a gun from a moving vehicle was not a "natural and probable incident or consequence of the use of an automobile by an uninsured motorist." Further, "it was not a risk against which the insurer and the insured might reasonably expect that protection would be afforded under a policy providing uninsured motorist coverage." *See also Ohio Casualty Group of Ins. Cos. v. Bakaric,* 355 Pa.Super. 345, 513 A.2d 462, 465 (1986); *Gen. Accident Fire & Life Assurance Corp. v. Appleton,* 355 So.2d 1261, 1263 (Fla.Dist.Ct.App.1978). Courts

have traditionally refused to enlarge coverage provided by the insurance contract without regard to the intent of the parties when entering the contract. *Dairyland Ins. Co. v. Esterling*, 205 Neb. 750, 290 N.W.2d 209, 213 (1980); *Nat'l Union Fire Ins. Co. v. Bruecks*, 179 Neb. 642, 139 N.W.2d 821, 826 (1966).

When considering these principles together with the facts of the current case, I must agree with Prudential that such an accident was not covered by the terms of the policy. The cause of the injury was the gun, not the vehicle. The only connection between either automobile and the shooting was that the automobiles transported the respective parties to the location where the shooting occurred. *Gilbertson v. State Farm Mut. Auto. Ins.*, 845 F.2d 245 (10th Cir.1988), is illustrative of this point. There, the insured loaned her car to a friend, York. York, after getting drunk, drove to an overpass on a highway and dropped a fifty-one pound boulder onto a car below, killing one person and injuring two others. Holding that the incident was not covered by the uninsured motorist policy, the court stated as follows:

> The real question in this case is one of causation. The court feels that York's exiting the car, removing the rock from the car, carrying the rock to the ledge and then allowing it for fall, taken together, constituted an act of independent significance which broke the causal link between the use of the car and the Gilbertsons' injuries. Neither the car's locomotion nor any of its mechanical functions was involved in either York's dropping the rock nor the rock's hitting the Gilbertson vehicle.

Plaintiffs, in urging that Willard's wounds were covered by the uninsured motorist policy, cite *Southeastern Fidelity Ins. Co. v. Stevens*, 142 Ga.App. 562, 236 S.E.2d 550 (1977) and *Valdes v. Smalley*, 303 So.2d 342 (Fla.Dist.Ct.App.1974). In *Stevens*, the insured's son was killed when a gun, which was being carried in the vehicle, discharged immediately after the insured pulled off a smooth road on to a bumpy, rutted road. The court held that the discharge of the gun was directly related to the inherent use of the vehicle, because the driving of the vehicle most likely caused the gun to discharge. In *Valdes* a mug was thrown from a moving vehicle, resulting in the death of a teenage boy. The court ruled that the throwing of the mug and the high speed of the vehicle were *concurrent* causes of the accident because the high speed of the vehicle added to the velocity of the mug.

Unlike these cases wherein the use of the vehicle actually concurred in causing the injury, the vehicle in the present case was merely the location of the shooting. The accident did not arise out the "inherent purpose" of the vehicle, nor did either vehicle contribute or combine with any other force to cause Willard's injury. The gun and bullets were the sole cause of his injury. Like the case of *Gen. Accidental Fire & Life Assurance Corp. v. Appleton, supra,* wherein the insured was attacked by three men while riding in their vehicle, the injury was not caused by the automobile but by the criminal acts of others.

The majority, as an example, states that if instead of firing a gun, Kelley "had thrown a large object out of the car and onto the path of Willard's vehicle causing him to crash, there would be little doubt that whatever had been thrown *from* the car facilitated a getaway *in the car* and may be deemed to have arisen out of the car's *use as a means to accomplish the desired escape.*" For two reasons, I believe that this example is not applicable to the present case. First, in the majority's example, the velocity of the vehicle would have contributed directly to the injury sustained. As in *Valdes*, the speed of the vehicle may be considered a cause concurrent with the throwing of an object. Here the gun and bullets were the sole cause of Willard's injury; the vehicle did not cause or contribute to his injury. Secondly, the majority example points out that the vehicle might have contributed to the escape. However, that is not the focus when determining whether a causal connection exists. The nexus must exist between the plaintiff's injury and tortfeasor's vehicle, not

between the vehicle and the tortfeasor's escape.

Similar results have been reached by many other states who have confronted this problem. *Ohio Casualty Group of Ins. Cos. v. Bakaric,* 355 Pa.Super. 345, 513 A.2d 462 (1986) (automobile liability insurance did not cover a shooting which occurred in an automobile because the accident did not arise out of the use of the vehicle); *Rustin v. State Farm Mut. Auto. Ins. Co.,* 254 Ga. 494, 330 S.E.2d 356 (1985) (automobile liability policy did not cover a shooting death which occurred after an automobile accident because the injury did not arise out of the use of the vehicle); *State Farm Mut. Auto. Ins. Co. v. Smith,* 107 Idaho 674, 691 P.2d 1289 (Ct.App.1984) (automobile liability policy did not cover accidental shooting which occurred in vehicle because the accident did not arise out of the use of the vehicle); *Union Ins. Co. v. Connelly,* 694 P.2d 354 (Colo.Ct.App. 1984) (automobile liability policy did not cover accidental shooting which occurred when a gun was unloaded from the vehicle because the injury did not arise out of the use of the vehicle); *Sciascia v. Am. Ins. Co.,* 183 N.J.Super. 352, 443 A.2d 1118 (1982) (uninsured motorist policy did not cover deliberate shooting perpetrated by a moving vehicle because it did not arise out of the use of the automobile); *Love v. Farmers Ins. Group,* 121 Ariz. 71, 588 P.2d 364 (Ct.App.1978) (automobile liability policy held not to cover the assault and murder of insured who was abducted in his vehicle and driven to a deserted area where he was killed); *Nationwide Mut. Ins. Co. v. Knight,* 34 N.C.App. 96, 237 S.E.2d 341 (1977) (automobile liability policy did not cover an intentional shooting perpetrated by a person in a moving vehicle because it did not arise out of the use of the vehicle); *Employers Casualty Co. v. Azar,* 28 Colo. App. 566, 479 P.2d 979 (1970) (automobile liability policy did not cover accidental shooting because the incident did not arise out of the use of the vehicle); *Nat'l Union Fire Ins. Co. v. Bruecks,* 179 Neb. 642, 139 N.W.2d 821 (1966) (automobile liability policy did not cover accidental shooting because the injury did not arise out of use of

the vehicle); *Culp v. Northwestern Pac. Indem. Co.,* 365 F.2d 474 (10th Cir.1966) (automobile liability policy did not cover injuries caused by a fight between two men who were unloading a truck at the time of the incident).

The Wisconsin Supreme Court faced an analogous situation in *Tomlin,* 290 N.W.2d at 285. In *Tomlin,* a police officer stopped a young man for a traffic violation. After asking the man to exit his vehicle, the officer noticed several beer cans in the floorboard and bent to examine them. The young man then stabbed the officer seven times. When considering whether this injury arose out of the use of the vehicle, the court resolved that, as a matter of law, the vehicle's connection with the injury was not sufficient to bring it within the terms of the policy. Thus, the incident was not covered.

The majority remands to the trial court for a determination of whether the injury was an "accident" within the meaning of the policy. Only if the injury occurred in the course of "use" of the vehicle as legally defined here would I then be concerned with whether it was accidental or otherwise; it is thus of no consequence here. *Vanguard Ins. Co. v. Cantrell,* 18 Ariz. App. 486, 503 P.2d 962 (1973) is a case correctly identifying the principles governing both "use" and "intent." There, the insured brought suit against the insurer, alleging that his injuries arose out of the use of a vehicle. The insured was shot by a fleeing felon during a robbery. The perpetrator drove up to the drive-in window and ordered the insured to give him all the money in the store. After the insured complied, the perpetrator started to drive off and fired a shot over his shoulder. He testified that he did not intend to harm anyone, but only meant to frighten the insured when he fired the gun. The court found that the injury did not arise out of the use of the vehicle:

> From the standpoint of causation, this injury could have occurred in the woods, in a hunting lodge, or in a house. That the situs of the accident was in fact within a motor vehicle and the fact that both the tort-feasor and the injured party were 'using the car' at the time does not

make the injury one 'arising out of the ... use' of the vehicle. Nor did the injury result from any incident of 'ownership' of the vehicle. (Citation omitted)

The court also recognized that the question of intent was not relevant to the determination of "use," but was only a consideration with regard to the issue of "accident." The court reasoned that because the act was unintentional from the standpoint of the insured, it was an "accident" within the terms of the policy. *See Celina Mut. Ins. Co. v. Saylor*, 35 Ohio Misc. 81, 301 N.E.2d 721 (1973). But the insured in *Vanguard* lost his claim under his automobile policy because his injury did not arise out of use of the vehicle.

The proper focus is whether the shooting of Willard was causally connected to the use of an uninsured motor vehicle. I must agree with the reasoning used by a majority of our sister jurisdictions, which hold that as a matter of law gunshot wounds are not normally causally related to the use of the automobile, even if the vehicle was used in transportation to the location where the shooting occurred. No material facts as to use of the vehicle are here in dispute, and summary judgment in favor of Prudential is proper.

I am authorized to state that Justice LAVENDER joins in these views and that Justice SIMMS joins in part.